**KENNEDY FOR PRESIDENT COMMITTEE, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**American Broadcasting Companies, Inc., CBS Inc. and National Broadcasting Company, Inc., Intervenors.**

No. 80–1549.

United States Court of Appeals, District of Columbia Circuit.

Argued May 30, 1980.

Decided May 31, 1980.

Opinions Aug. 6, 1980.

99. See text *supra* at note 44.

101. *CBS v. Democratic Nat'l Comm., supra* note 91, 412 U.S. at 112–113, 93 S.Ct. at 2091, 36 L.Ed.2d at 789, quoting *Report on Editorial-* izing by Broadcast Licensees, 13 F.C.C. 1246, 1249 (1949).

102. *Id.* at 124, 93 S.Ct. at 2097, 36 L.Ed.2d at 796.

103. *Id.* at 125, 93 S.Ct. at 2097–2098, 36 L.Ed.2d at 796.

See also, D.C.Cir., 636 F.2d 417.

434

Joseph F. Hennessey, Washington, D. C.,
with whom John E. Nolan, Jr., and William
C. Oldaker, Washington, D. C., were on
brief, for petitioner.

David J. Saylor, Deputy Gen. Counsel, F.
C. C., Washington, D. C., with whom Robert
R. Bruce, Gen. Counsel, Daniel M. Arm-
strong, Asst. Gen. Counsel, Clifford G. Pash,
Jr., and Lisa B. Margolis, Counsel, F. C. C.,
Washington, D. C., Sanford M. Litvack,
Asst. Atty. Gen., Barry Grossman and Nan-
cy C. Garrison, Attys., Dept. of Justice,
Washington, D. C., were on brief, for re-
spondents.

J. Roger Wollenberg, Washington, D. C.,
with whom Timothy B. Dyk, Washington,
D. C., was on brief, for intervenor CBS Inc.

James A. McKenna, Jr., Thomas N. Fro-
hock and Carl R. Ramey, Washington, D. C.,
were on brief, for intervenor American
Broadcasting Companies, Inc.

Bernard G. Segal, Jerome J. Shestack,
Philadelphia, Pa., Stephen A. Sharp, Wash-
ington, D. C., Corydon B. Dunham, New
York City, and Howard Monderer, Wash-
ington, D. C., were on brief, for intervenor
National Broadcasting Company, Inc.

Before ROBINSON, MacKINNON and
MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit
Judge SPOTTSWOOD W. ROBINSON, III.

Concurring opinion filed by Circuit Judge
MacKINNON.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

On March 14, 1980, the three major commercial television networks[1] broadcast a half–hour speech by President Carter from 4:00 to 4:30 p. m. and a presidential press conference from 9:00 to 9:30 p. m. On each occasion, the principal topic of discussion was the state of the Nation's economy. Each event was presented in its entirety and, with but one exception, was televised live by each network.[2] The President's statements were also reported in the course of the networks' regularly scheduled national and local newscasts.

The Kennedy for President Committee, the petitioner herein, charges that these programs saturated the American public with the President's views on the economy only four days before the 1980 Illinois presidential primary. That, petitioner asserts, diminished the chances of its candidate, Senator Edward M. Kennedy, of winning the Democratic Party's presidential nomination later in the year. Petitioner claims that Section 312(a)(7) of the Communications Act of 1934[3] and the well–known fairness doctrine separately entitle the Senator to time for telecasts of his own ideas and proposals on economic conditions.

The networks denied petitioner's request for responsive time,[4] and the Federal Communications Commission rejected petitioner's bid for an administrative directive therefor.[5] Before us now is a petition for review of the Commission's order. We agree with the Commission that petitioner's reliance on Section 312(a)(7) is misplaced, and that petitioner failed to establish the elements of a prima facie case under the fairness doctrine. We accordingly affirm.[6]

## I. BACKGROUND

Reacting to announcements of plans to televise President Carter's March 14 speech and press conference, petitioner implored the networks to provide Senator Kennedy with an opportunity to speak in prime time to the American people on the economy.[7] Petitioner attached special importance to an airing of the Senator's views on that subject, stating that the economic situation was "one of the major issues that compelled Senator Kennedy to challenge Mr. Carter for the Democratic nomination."[8] Petitioner asked that time be made available for the Senator's use prior to the March 18 Illinois primary.[9]

Independently, the networks refused. In each instance, they construed petitioner's request as an invocation of the equal–opportunity command of Section 315(a) of the Communications Act,[10] and expressed the belief that the telecasts in question were

---

1. The networks, intervenors here, are American Broadcasting Companies, Inc. (ABC); CBS Inc. (CBS); and National Broadcasting Co., Inc. (NBC).

2. All three networks televised the speech live. NBC and CBS also carried the press conference live, but ABC delayed its presentation until 11:45 p. m. *Kennedy for President Comm.*, F.C.C. Mimeo No. 30175 (May 15, 1980), at 1–2 & n.3, Joint Appendix (J.App.) 3–4 & n.3 [hereinafter cited as *Bureau Opinion*].

3. 47 U.S.C. § 312(a)(7) (1976), quoted in text *infra* at note 47.

4. See Letter from Edward M. Fouhy, Vice President and Bureau Chief, CBS News, to Patrick J. Lucey, Deputy Campaign Manager, Kennedy for President Committee (Mar. 17, 1980), J.App. 20; Letter from Alan H. Gerson, Vice President, Compliance & Practices, NBC, Inc., to Patrick J. Lucey (Mar. 17, 1980), J.App. 22; Letter from Carl Bernstein, Washington Bureau

Chief, ABC News, to Patrick J. Lucey (Mar. 20, 1980), J.App. 24.

5. *Bureau Opinion, supra* note 2, J.App. 3; *Kennedy for President Comm.*, F.C.C. Docket No. 80–281 (May 19, 1980), J.App. 1 [hereinafter cited as *Commission Opinion*].

6. As in *Kennedy for Pres. Comm. v. FCC (Kennedy I)*, 636 F.2d 417 (D.C.Cir.1980), we announced our decision on May 31, the day after oral argument, because the last presidential primaries of 1980 were imminent. The reasons for our decision are set forth herein.

7. J.App. 19.

8. J.App. 19.

9. J.App. 19.

10. As amended, 47 U.S.C. § 315(a) (1976).

exempt from that requirement as on–the–spot coverage of bona fide news events.[11] Each network reminded petitioner that it had given extensive coverage to the Senator's campaign, and to his position on economic issues.[12] Two of the networks[13] emphasized their earlier presentations of wide spectra of economic commentary and analysis encompassing numerous alternatives to the strategems advanced by the President.[14]

Petitioner then turned to the Commission for "redress [of] a pattern of conduct causing an unacceptably imbalanced presentation of important facts."[15] Petitioner specifically identified Section 312(a)(7) of the Communications Act[16] and the long–established fairness doctrine[17] as bases for a Commission order to the networks to make time available to the Senator. It is noteworthy that petitioner has pointedly disclaimed any reliance on Section 315(a)'s equal–opportunity provision, and has accused the networks of replying to an equal-opportunity demand never made.[18]

At the first level of Commission consideration, the Broadcast Bureau denied relief.[19] It first declared that petitioner's dependence on Section 312(a)(7) was faulty; "[g]iven the availability of prime time for purchase," it said, "the networks' failure to furnish free time does not raise a Section 312(a)(7) question."[20] With respect to the fairness doctrine, the Bureau concluded that petitioner had not established a prima facie case of violation because it had nei-

ther alleged nor substantiated any instance of bad faith on the networks' part or any failure to present contrasting views on economic issues in their overall programming.[21] The Bureau cited petitioner's statement that it had "no doubt that" the networks "acted in good faith,"[22] pointed out that under the fairness doctrine no particular individual or group is entitled to present alternative outlooks,[23] and observed that "[e]ven if [petitioner] believes that the controversial issue of public importance in this case is defined as which candidate for the Democratic Party's nomination has the soundest economic proposals, there is no evidence presented that this issue was discussed in the broadcast .... [T]he networks have indicated that they have presented coverage of Senator Kennedy's economic viewpoints."[24] The Bureau readily acknowledged that an incumbent President commands a media advantage over opponents, but deemed that ascendancy inevitable in light of the public interest in informing all Americans of newsworthy presidential appearances.[25] The Bureau noted that it was precisely to increase reporting of campaign activity that Congress in 1959 amended Section 315(a) to exempt news coverage from the equal–opportunity requirement.[26]

In essence, then, the Bureau held that Section 312(a)(7) does not entitle a candidate to free time when time is available for purchase,[27] and that establishment of a prima facie case under the fairness doctrine

---

11. See letters cited *supra* note 4.

12. See letters cited *supra* note 4.

13. ABC and NBC.

14. See Bernstein–Lucey letter, *supra* note 4; Gerson–Lucey letter, *supra* note 4.

15. Letter from John E. Nolan, Jr., William C. Oldaker and Joseph F. Hennessey, on behalf of petitioner, to William J. Tricarico, Secretary of the Commission (Apr. 4, 1980), J.App. 11 [hereinafter cited as Free Time Request].

16. 47 U.S.C. § 312(a)(7) (1976), quoted in text *infra* at note 47.

17. See Part III *infra*.

18. Brief for Petitioner at 30.

19. *Bureau Opinion, supra* note 2, at 8, J.App. 10.

20. *Id.* at 4, J.App. 6.

21. *Id.* at 6–7, J.App. 8–9.

22. *Id.* at 5, J.App. 7.

23. *Id.* at 6, J.App. 8.

24. *Id.* at 7, J.App. 9.

25. *Id.*

26. *Id.* at 7–8, J.App. 9–10.

27. *Id.* at 4, J.App. 6.

demands more than a bare conclusory assertion that a broadcaster has not balanced his programming on an important and controversial issue.[28] Without awaiting an application from petitioner, the Commission, in the interest of expedition, examined the Bureau's decision and affirmed simply on the basis of the Bureau's opinion.[29] Then followed the instant petition for review by this court.

## II. THE SECTION 312(a)(7) CLAIM

Petitioner's Section 312(a)(7) contention is that the statute required the networks to allot free time to Senator Kennedy, particularly in consequence of the so-called saturation coverage of President Carter's economic views shortly before the Illinois primary. Two theories are advanced in attempted support of this position. One is that Section 312(a)(7) provides a candidate for federal elective office with a contingent right of access to free time, triggered in this instance by the telecasts of the President's March 14 speech and press conference.[30] The other is that, independently of this contingent right, the section confers upon such a candidate direct and unqualified entitlement to use broadcast facilities without charge.[31]

As soon we shall see, Sections 312(a)(7) and 315(a)[32] of the Communications Act work in tandem to govern access to broadcast media by candidates for public office.

With the interaction of these two sections at the heart of federal intervention in political broadcasting, we begin our assessment of petitioner's arguments with an analysis of their interrelationship.

### A. The Statutory Scheme

The first part of Section 315(a) is its equal–opportunity provision, frequently referred to as an equal–time grant.[33] In pertinent part it states:

> If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided*, ... No obligation is imposed under this subsection upon any licensee to allow the use of its station by any such candidate.[34]

The import of this language is clear: any broadcaster who permits a "use" of station facilities by a legally qualified candidate must provide equal opportunities[35] to that candidate's opponents. As originally enacted, this was the full extent of Section 315(a),[36] but in 1959 Congress amended it to exclude candidate appearances in bona fide newscasts and news interviews, bona fide documentaries in which the appearance is incidental, and on–the–spot coverage of

---

**28.** *Id.* at 8, J.App. 10.

**29.** *Commission Opinion, supra* note 5, at 2, J.App. 2.

**30.** Petitioner does not cast its argument in these precise terms, but both in its brief and during oral argument it repeatedly spoke of a right to free time for Senator Kennedy germinated by the networks' coverage of President Carter's March 14 speech and press conference, as well as by prior broadcasts of that type. See Brief for Petitioner at 15–16, 23, 29–30.

**31.** Brief for Petitioner at 15–16, 21–22.

**32.** As amended, 47 U.S.C. § 315(a) (1976), the relevant parts of which are quoted in text *infra* at notes 34, 42.

**33.** The statutory language is "equal opportunities," but the phrase "equal time" has come to be used interchangeably. In reality, the latter

is less accurate since the required parity demands more than allotment of the same amount of time. The broadcaster must also provide the candidate with time at an equal rate, at a comparable hour of the day, and with a similar format for presentation. See note 40 *infra* and accompanying text.

**34.** 47 U.S.C. § 315(a) (1976).

**35.** See note 33 *supra*; note 40 *infra* and accompanying text.

**36.** The forerunner of the equal–opportunity provision was enacted as § 18 of the Radio Act of 1927, 44 Stat. (pt. II) 1170. It was subsequently reenacted as § 315(a) of the Communications Act of 1934, ch. 652, tit. III, § 315, 48 Stat. 1088, as amended, 47 U.S.C. § 315(a) (1976).

bona fide news events–which no longer constitute a "use" of broadcast facilities, and therefore are unencumbered by the equal–opportunity obligation.[37] Since Section 315(a), as its proviso specifically states, does not impose an unconditional obligation on broadcasters to allow use of their station facilities by any candidate, the equal–opportunity grant has aptly been characterized as a contingent right of access.[38] It does not compel a broadcaster to afford access to any candidate in the first instance, but it does mandate parity for all candidates for a given office once access by one is permitted.[39] The duty is thus no more or less than to accord equal treatment to all legally qualified candidates for the same public office, and "equal opportunity" encompasses such elements as hour of the day, duration and charges.[40]

As we have noted, four categories of news–type programs are expressly exempted from this equal–opportunity mandate.[41] Those programs, like others, however, remain subject to the exigencies of the public interest and the demands of the fairness doctrine. The last sentence of Section 315(a) makes plain that broadcasters are not relieved,

in connection with the presentation of newscasts, news interviews, news documentaries, and on–the–spot coverage of news events, from the obligation imposed upon them under [the Act] to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.[42]

This language, placed in Section 315(a) in 1959 when Congress added the exemptions to the equal–opportunity provision,[43] codifies the fairness doctrine formulated by the Commission in 1949.[44] So, while broadcast of an event exempted by Section 315(a) does not enliven the equal-opportunity requirement, it does summon adherence to public–interest and "fairness" considerations. Since we address the ramifications as well as the confines of the fairness doctrine in detail at a later point, we need not dwell upon them now.[45] It is sufficient merely to say that this is another means by which a candidate might gain entree to broadcast facilities for use in his campaign.[46]

The third leaf of the triad governing candidate access to broadcast media is Section 312(a)(7), which authorizes the Commission to

revoke any station license or construction permit . . . for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy.[47]

**37.** See the discussion in *Kennedy I, supra* note 6, text at notes 40–48. *Chisholm v. FCC*, 176 U.S.App.D.C. 1, 8–9, 538 F.2d 349, 356–357, *cert. denied*, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976).

**38.** See *Kennedy I, supra* note 6, at n.61.

**39.** See text *supra* at note 34.

**40.** See *The Law of Political Broadcasting and Cablecasting*, 69 F.C.C.2d 2209, 2216, 2260–2262 (1978). See also *id.* at 2262–2268; *Use of Broadcast and Cablecast Facilities by Candidates for Public Office*, 34 F.C.C.2d 510, 519 (1972).

**41.** See note 37 *supra* and accompanying text.

**42.** 47 U.S.C. § 315(a) (1976).

**43.** Act of Sept. 14, 1959, Pub.L.No. 86–274, § 1, 73 Stat. 557.

**44.** *1949 Report on Editorializing by Broadcast Licensees*, 13 F.C.C. 1246 (1949). See discussion in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 377–378, 89 S.Ct. 1794, 1799–1800, 23 L.Ed.2d 371, 381–382 (1969); note 149 *infra*. See also Part III *infra*.

**45.** See Part III *infra*.

**46.** We later point out that while the fairness doctrine enjoins broadcasters to present contrasting viewpoints on controversial issues of public importance, a candidate cannot insist as of right that he be a spokesman. See text *infra* at notes 153, 173–175.

**47.** 47 U.S.C. § 312(a)(7) (1976). We have held that § 312(a)(7), though in literal terms applicable only to a "broadcasting station," levies its requirements on networks as well. *CBS v. FCC*, 629 F.2d 1, at 25–27 (D.C.Cir. 1980). See

The import of this passage is the focus of the instant litigation, and it is immediately apparent that its language alone does not dispense with need for inquiry into whether Section 312(a)(7) was intended to serve as an auxiliary to Section 315(a)'s equal–opportunity specification nor whether, when applicable, it assures candidates of some quantum of free time.

This is not the first time that a controversy has arisen over interpretation of Section 312(a)(7). In our recent decision in *CBS v. FCC*,[48] we addressed the question whether Section 312(a)(7) was enacted as a new and additional entitlement to broadcast–media access for federal candidates, or whether it merely codified the preexisting duty of broadcasters to provide time to such candidates pursuant to the general mandate to operate in the public interest.[49] Reading Section 312(a)(7) in light of its legislative history, we concluded that it does indeed "create an affirmative right of access for individual candidates for federal elective office."[50] We did not, however, attempt to define the monetary parameters of that right, for *CBS* involved refusal of requests to *purchase* time.[51] To resolve the issues now before us–whether Section 312(a)(7) augments Section 315(a) as an additional but broader equal–opportunity exaction, and the extent to which it independently grants access on a free basis–we must return to the legislative history and undertake a somewhat broader analysis.

B. *The Legislative History of Section 312(a)(7)*

Section 312(a)(7) had its genesis in the Federal Election Campaign Act of 1971.[52] Title I of that legislation, denominated the "Campaign Communications Reform Act,"[53] contained three distinct provisions: the reasonable–access requirement now embodied in Section 312(a)(7);[54] the lowest–unit–cost specification which is now Section 315(b)(1);[55] and a spending limitation on use of communications media by candidates for federal elective office, which has since been repealed.[56] Each provision stemmed from serious congressional concern over the ever–mounting expense of modern electioneering.

As in *CBS* we observed, "[t]oday, there can be no doubt that we are in the 'era of television campaigning.'"[57] "Indeed," we said, "since 95 percent of our people operate a television set for an average of over five hours a day, and 60 percent of them rely primarily on television for news, it would be hard to overestimate the importance of television to our political processes."[58] This has not been an overnight phenomenon; nearly a decade ago Congress recognized that in consequence of its increasing public significance television was both boon and bane to the American electoral process. As one Member put it, "we have in the technology of television the potential renaissance of the Athenean forum where the public gathers, political contenders debate the issues and enlightened citizen decisions are

also *Senator Eugene J. McCarthy*, 11 F.C.C.2d 511 n.1 (1968) (construing what is now 47 U.S.C. § 315(a) (1976)).

**48.** *Supra* note 47.

**49.** *Id.* at 13.

**50.** *Id.* at 21.

**51.** *Id.* at 3–4.

**52.** Pub.L.No. 92–225, tit. I, § 103(a)(2)(A), 86 Stat. 4 (1972) [hereinafter usually cited as codified].

**53.** *Id.* § 101, 86 Stat. 3.

**54.** 47 U.S.C. § 312(a)(7) (1976), quoted in text *supra* at note 47.

**55.** 47 U.S.C. § 315(b)(1) (1976), quoted *infra* note 97.

**56.** 47 U.S.C. § 803(a), *repealed*, Pub.L.No. 93–443, tit. II, § 205(b), 88 Stat. 1278 (1974).

**57.** *CBS v. FCC, supra* note 47, at 11, quoting Wick, *The Federal Election Campaign Act of 1971 and Political Broadcast Reform*, 22 De Paul L.Rev. 582 (1973).

**58.** *CBS v. FCC, supra* note 47, at 438–439 (footnotes omitted).

formed."[59] But to many the exorbitant cost of television campaigning seemed more likely to inspire a rebirth of the oligarchical aspects of the Athenian government than a resurgence of the high level of civic awareness and participation for which Athenian citizens were renowned. Reliance on radio and television programming had become so expensive a necessity for would–be holders of public office that one Congressman was prompted to accuse the "[s]kyrocketing costs of campaigning in this electronic era" of having "increasingly made elective politics the special preserve of the wealthy or of those who have access to the funds of well–healed [sic] special interests."[60]

The dangers inherent in the rising cost of funding television appearances by candidates were very much in the minds of Members when the Campaign Communications Reform Act was under congressional consideration. Senator Muskie, testifying before the Senate Commerce Committee's Subcommittee on Communications on the effects of expensive media campaigns, stated:

At the time our Nation was founded many States had property qualifications for voting. It was believed that only a man who wanted to preserve his land and wealth was responsible enough to participate in political affairs. Fortunately, our concept of political equality has developed tremendously since that time. Now the belief that all citizens, regardless of wealth, should have an equal opportunity to participate in politics is an axiom of our political system. This idea that wealth could be a prerequisite for voting today would be met with well–deserved outrage.

But, as our practices of equality in voting have grown, our opportunities for equality in seeking office have shrunk. Once again, wealth is a barrier to democratic practice. Today it is not State statutes, but the extraordinary cost of running a campaign that keeps all but those who can raise vast amounts of money from seeking office. If we do not drastically alter our campaign practices, only those who are wealthy, or who are chosen by the wealthy will be able to compete for elective office. This is an outrage in a democratic nation.[61]

Senator Muskie's fears were shared by many of his colleagues.[62] The mood of Congress was perhaps best reflected by Senator Mathias, who said:

We all know how the broadcast media has affected the workings and integrity of campaigns. There are elected representatives and defeated candidates whose political status has been determined on the basis of their access to the television screens of the voters. And access requires money.

I have stated on numerous occasions that this crazy, self–destructive scheme must be curtailed. The system has acquired an advantage over the candidates and the candidates are taking advantage of the public.[63]

It would be a mistake, though, to surmise that the legislators were necessarily determined to limit the role of television in election efforts.[64] Instead, as in 1959—when the

---

59. 117 Cong.Rec. 272 (1971) (remarks of Senator Gravel).

60. Id. For estimates of total campaign expenses and media costs, see Hearings Before the Subcomm. on Communications of the Senate Comm. on Commerce on S.1, S.382, and S.956, 92d Cong., 1st Sess. 151 (1971) [hereinafter cited as Hearings on S.1, S.382, and S.956].

61. Hearings on S.1, S.382, and S.956, supra note 60, at 353 (testimony of Senator Muskie).

62. See e. g., id. at 1 (opening remarks of Senator Pastore); 117 Cong.Rec. 272 (1971) (re-

marks of Senator Gravel); id. at 43147 (remarks of Representative MacDonald).

63. Id. at 3895 (remarks of Senator Mathias). Similarly, Senator Kennedy commented, "[t]he recent political landscape of America is strewn with the graves of incumbents and challengers blitzed with defeat by an unlimited assault of television spending." Hearings on S.1, S.382, and S.956, supra note 60, at 173 (testimony of Senator Kennedy).

64. A predominant view seems to have been that television had a vast, underutilized potential to serve the needs of the American elector-

equal–opportunity provision of Section 315(a) was modified by exemptions [65]—the goal Congress had in mind in 1971 was to make the medium more responsive to civic needs, and to provide better and more complete information to the American public.[66] The debates on the floors of both Houses evince a congressional intent to improve the quality of television campaigning [67] and at the same time to take measures to decrease its cost.[68] It was believed that the informa-

tional and educational aspects of political broadcasting could greatly be enhanced by ensuring that more time would be made available to candidates at lower rates.[69] This expectably would encourage less dependence on thirty– to sixty–second "spots" —necessarily little more than slogans [70]—in favor of longer, more illuminating presentations; it would also enable more candidates to afford the television appearances so instrumental to present–day electioneering.[71]

al process. See, e. g., 117 Cong.Rec. 272 (1971) (remarks of Senator Gravel), quoted in text supra at note 59; id. at 273 (Senator Gravel, quoting testimony of Adlai Stevenson before the Senate Commerce Committee); id. at 43169 (remarks of Representative MacDonald). Senator Pearson, for example, pointed out that the increased size of the electorate has rendered television "the most effective communication tool yet devised and thus . . . is essential to any modern campaign." Hearings on S.1, S.382, and S.956, supra note 60, at 351 (statement of Senator Pearson).

**65.** See text supra at notes 33–37.

**66.** See Kennedy I, supra note 6, text at notes 41–45; Chisholm v. FCC, supra note 37, 176 U.S.App.D.C. at 10, 538 F.2d at 358. It was also felt that such improvements would restore the diminishing confidence and interest of American voters in the electoral process. See Hearings on S.1, S.382, and S.956, supra note 60, at 207–208, 214 (statement of Russell Hemenway, National Director, National Committee for an Effective Congress); id. at 399 (statement of Newton N. Minow, Chairman, Twentieth Century Fund Commission on Campaign Costs in Electronic Era); id. at 506 (statement of Anne Martindell, Vice Chairman, New Jersey Democratic State Committee); id. at 631–632 (statement of Senator Spong).

**67.** Many Congressmen, as well as experts who testified at the Senate Committee hearings, condemned the use of "spots" in political broadcasting—televised advertisements less than one minute in duration. See, e. g., Hearings on S.1, S.382, and S.956, supra note 60, at 169 (testimony of Senator Kennedy); id. at 336–339 (colloquy between Senator Hartke and Senator Scott). These, it was felt, were little more than blatant attempts to put a candidate's name before voters through the use of catchy slogans and evocative pictures without providing any real information to the public about the candidate's stand on important issues. One witness termed spot advertising an attempt "to stimulate [a] Pavlovian response from the voter," id. at 487 (testimony Charles M. Kinsolving, Jr., Vice Chairman, New York County Democratic Executive Committee), and the

need for improvement was repeatedly emphasized. See, e. g., id. at 165 (remarks of Senator Hartke); id. at 185 (testimony of Dean Burch, Chairman, FCC); id. at 400–401 (testimony of Newton N. Minow, Chairman, Twentieth Century Fund Commission on Campaign Costs in Electronic Era); id. at 472 (statement of Senator Dole).

**68.** The debates contain a great deal of discussion over the rates charged candidates by broadcasters. In general, the problem arose from the short–term, cyclical nature of political broadcasting as well as the low volume of time purchased by any one candidate, making it impossible for candidates to take advantage of the many discounts available to users with whom broadcasters had longer–term associations. Also cited, however, were instances of alleged abuse by broadcasters, such as imposition of excessive rates simply because of the candidate's political status. See, e. g., 117 Cong.Rec. 3896 (1971) (remarks of Senator Mathias); id. at 28813 (remarks of Senator Prouty); id. at 43147 (remarks of Representative MacDonald); Hearings on S.1, S.382, and S.956, supra note 60, at 171 (testimony of Senator Kennedy); id. at 193 (testimony of Dean Burch, Chairman, FCC).

**69.** In turn, voters would be expected to take more interest in the process and in more educational and informative programs. See note 66 supra.

**70.** See note 67 supra.

**71.** It was believed that cost was a major factor in resort to spots. See note 67 supra. Since candidates sought to maximize the cost–effectiveness of their broadcasting, many succumbed to the temptation to use spots which were proven winners in terms of getting votes. In the elections preceding the 1971 hearings on the subject, it was estimated that ninety percent of funds spent on political broadcasting was devoted to spots. Hearings on S.1, S.382, and S.956, supra note 60, at 165, 178 (remarks of Senator Hartke). Longer programming was often less popular and too revealing of the

The amendments forged by the Campaign Communications Reform Act thus were inspired principally by concern that the broadcast media were not making enough time available to candidates[72] and that candidates were being charged excessively high rates for the time they were permitted to purchase.[73] But while these problems were clearly enough defined, approaches to their solutions were not. A number of bills were brought before each House proposing amendments to the Communications Act designed to achieve the desired reforms. The three bills of greatest significance in formulation of the Campaign Communications Reform Act were introduced in the Senate, and the focal point of these proposals was the equal–opportunity provision of Section 315(a) of the Act.

S. 1, the first of the three bills, would have added to Section 315(a) the following language:

> Each broadcasting station and each network of such stations shall make available without charge the use of its facilities in accordance with this section to candidates in a presidential election for the offices of President and Vice President of the United States. . . .[74]

Need for an appearance by one candidate to trigger the equal–opportunity component of Section 315(a) thus would be suspended for presidential and vice–presidential contenders, but would remain for all other candidates.

S. 1 was the subject of extensive testimony during hearings conducted by the Subcommittee on Communications of the Senate Committee on Commerce.[75] Several witnesses enthusiastically supported the concept of free time. Some believed that broadcasters should be made to provide free time as part of their duty to operate in the public interest;[76] others suggested that the Federal Government appropriate funds to purchase such time–to be designated "voters' time"–on behalf on the public.[77]

Numerous objections were raised to both ideas, however. The networks asserted their willingness to offer free time,[78] but vigorously opposed stipulations as to how much.[79] A number of witnesses at the hearings seemed to believe that an absolute requirement was unnecessary, and some legislators expressed a reluctance to legislate in their own behalf by commanding broadcasters to provide something for nothing.[80] Ultimately, S. 1 was rejected by the Committee.[81]

candidate's positions, thereby combining with costs to encourage the trend towards employment of spots. See generally, e. g., id. at 164–165 (colloquy between Senator Hartke and Senator Gravel); id. at 471 (statement of Newton N. Minow, Chairman, Twentieth Century Fund Commission on Campaign Costs in Electronic Era); 117 Cong.Rec. 273 (1971) (statement of Adlai Stevenson quoted by Senator Gravel).

72. See note 69 *supra.*

73. See notes 68, 71 *supra.*

74. S. 1, tit. II, § 332, 92d Cong., 1st Sess. (1971), *Hearings on S. 1, S. 382, and S. 956, supra* note 60, at 11–12.

75. *Hearings on S. 1, S. 382, and S. 956, supra* note 60.

76. See, e. g., id. at 167–168 (statement of Senator Gravel); id. at 561–562 (statement of Professor Jeffrey Barron).

77. See, e. g., id. at 399 (testimony of Newton N. Minow, Chairman, Twentieth Century Fund Commission on Campaign Costs in Electronic Era).

78. See, e. g., id. at 387 (testimony of Frank Stanton, President, CBS); id. at 408 (testimony of Julian Goodman, President, NBC).

79. See, e. g., id. at 395 (statement of Frank Stanton, President, CBS); id. at 418 (testimony of Leonard H. Goldenson, President, ABC).

80. See, e. g., id. at 163 (remarks of Senator Stevens); id. at 572 (remarks of Senator Cook). Cf. id. at 211 (remarks of Senator Baker) (expressing concern over legislation mandating discounted rates for candidates).

81. The Committee opted instead for what is nearly § 312(a)(7)'s current language, S.Rep. No.92–96, 92d Cong., 1st Sess. (1971), the evolution of which we are about to recount.

The other two principal bills before the Senate were S. 382[82] and S. 956.[83] These proposals would have abolished Section 315(a)'s equal–opportunity provision with respect to presidential and vice–presidential candidates,[84] a step advocated by many of those present at the hearings[85] as well as by Members on the floor of each chamber.[86] In the course of the hearings, the networks and various others with expertise in the field—including several Senators and Representatives—testified that the equal–opportunity feature of Section 315(a)[87] was itself the major impediment to the complete and accurate coverage necessary to fully inform the public of candidates' positions on major issues.[88] It was perceived that although the 1959 amendments to Section 315(a)—exempting four categories of bona fide news–type broadcasts from its equal–opportunity requirement[89]—had mitigated the problem, the statutory specification of equality for all legally qualified candidates for public office unduly curtailed coverage of principal contenders because broadcasters feared that allotting time to one candidate would inevitably lead to appearances by a string of hopefuls, even those who had no realistic chance of securing a victory or even of gaining substantial support.[90]

Promoters of abridgement of Section 315(a)'s equal-opportunity mandate also emphasized the recognized quality of broadcast coverage of the 1960 presidential campaign, a period during which Congress had temporarily suspended that requirement.[91] Many witnesses and legislators advanced their belief that the famed televised debates between John F. Kennedy and Richard M. Nixon were able to take place only because the equal–opportunity provision was not in effect.[92] The networks indicated their amenability to free time for such events in the future if they were permitted to limit telecasts to appearances of "major" candidates.[93]

To deal with the problem of high rates for campaign broadcasts,[94] and to enable candidates to cut campaign spending in keeping with a basic purpose of the Federal Election Campaign Act, both S. 382 and S. 956 proposed to amend Section 315(b) of the Communications Act, which then prohibited the cost of broadcast time to candidates from exceeding the cost to comparable

---

**82.** S. 382, 92d Cong., 1st Sess. (1971), *Hearings on S. 1, S. 382, and S. 956, supra* note 60 at 52–91.

**83.** S. 956, 92d Cong., 1st Sess. (1971), *Hearings on S. 1, S. 382, and S. 956, supra* note 60 at 92–144.

**84.** S. 382, title I, § 101(a), *Hearings on S. 1, S. 382, and S. 956, supra* note 60, at 53; S. 956, tit. I, § 303(a), 92d Cong., 1st Sess. (1971), *Hearings on S. 1, S. 382, and S. 956, supra* note 60, at 133. See note 115 *infra.*

**85.** See, *e. g., Hearings on S. 1, S. 382, and S. 956, supra* note 60 at 200 (testimony of Russell Hemenway, National Director, National Committee for an Effective Congress); *id.* at 381 (testimony of Frank Stanton, President, CBS); *id.* at 420 (statement of Leonard H. Goldenson, President, ABC).

**86.** *E. g.,* 117 Cong.Rec. 3896 (1971) (remarks of Senator Mathias); *id.* at 29005 (remarks of Senator Brooke).

**87.** See 47 U.S.C. § 315(a) (1976), quoted in text *supra* at note 34.

**88.** For example, Senator Kennedy testified that "[i]n its actual operation, the equal time provi-

sion should be called the no time provision." *Hearings on S. 1, S. 382, and S. 956, supra* note 60, at 171. See also, *e. g., id.* at 381 (testimony of Frank Stanton, President, CBS); *id.* at 420 (statement of Leonard H. Goldenson, President, ABC).

**89.** See text *supra* at notes 33–37.

**90.** See, *e. g., Hearings on S. 1, S. 382, and S. 956, supra* note 60, at 188 (testimony of Dean Burch, Chairman, FCC).

**91.** Joint Resolution of July 14, 1960, Pub.L.No. 86–677, 74 Stat. 554.

**92.** S.Rep.No.92–96, 92d Cong., 1st Sess. 21 (1971); *Hearings on S. 1, S. 382, and S. 956, supra* note 60, at 23 (testimony of Dean Burch, Chairman, FCC); *id.* at 382 (testimony of Frank Stanton, President, CBS); *id.* at 420 (statement of Leonard H. Goldenson, President, ABC).

**93.** See, *e. g., id.* at 380–381 (statement of Frank Stanton, President, CBS); *id.* at 420 (statement of Leonard H. Goldenson, President, ABC).

**94.** See note 68 *supra.*

users.[95] Both bills contained provisions precluding broadcasters from charging candidates amounts in excess of the lowest unit cost available for their slots, though S. 956 limited this requirement to specified periods preceding elections; during all other periods comparable user-rates could remain in effect.[96] This requirement became part of Title I of the Federal Election Campaign Act and is now codified as Section 315(b)(1) of the Communications Act.[97]

The principal differences between S. 382 and S. 956 involved their approaches to campaign media spending limitations.[98] One other variation, however, is key to our discussion. Unlike S. 382, S. 956 included a provision designed "to insure that all licensees make available to legally qualified candidates for public office reasonable amounts of time for use of broadcasting stations . . .,"[99] and broadcasters who failed to comply with this directive could have their licenses revoked by the Commission.[100] Although the principal source of the legislation eventuating as the Federal Election Campaign Act was S. 382, it was essentially this provision of S. 956 that was enacted as Section 312(a)(7).[101]

The drafters of S. 956 said very little about the function of the reasonable–access provision. We held in *CBS* that it was intended to confer at least an affirmative entitlement to use broadcast facilities; we found "a clear indication [in the legislative history] that candidates in *federal* elections were being singled out for something beyond the amorphous right of access created by the public interest doctrine."[102] Whether the phrase "reasonable access" extends a still broader right, however, is the issue now before us—whether Section 312(a)(7) requires broadcasters to furnish free time upon request of a candidate for federal elective office.

The most straightforward reading of the language of Section 312(a)(7) is that broadcasters may fulfill their obligation thereunder either by allotting free time to a candidate *or* by selling the candidate time at the rates prescribed by Section 315(b). Section 312(a)(7) in terms authorizes license or permit revocation "for willful or repeated failure to allow reasonable access to *or* to permit purchase of reasonable amounts of time for the use of a broadcasting station,"[103]

95. 47 U.S.C. § 315(b) (1970) (amended 1971).

96. See S. 382, tit. I, § 101(b), *Hearings on S. 1, S. 382, and S. 956, supra* note 60, at 53; S. 956, tit. I, § 302(b), 92d Cong., 1st Sess. (1971), *Hearings on S. 1, S. 382, and S. 956, supra* note 60, at 132.

97. Section 315(b)(1), as thus amended, now stipulates rate ceilings for campaign broadcasts as follows:
    The charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign for nomination for election, or election, to such office shall not exceed—
    (1) during the forty–five days preceding the date of primary or primary runoff election and during the sixty days preceding the date of a general or special election in which such person is a candidate, the lowest unit charge of the station for the same class and amount of time for the same period; and
    (2) at any other time, the charges made for comparable use of such station by other users thereof.
    47 U.S.C. § 315(b)(1) (1976).

98. S. 382 proposed a limitation on campaign media spending; S. 956 had no such restriction,

although it did place a limit on the use of personal or family wealth in all facets of campaigns. Compare S. 382, tit. I, 92d Cong., 1st Sess. (1971), *Hearings on S. 1, S. 382, and S. 956, supra* note 60, at 53–60, with S. 956, tit. I, § 608, 92d Cong., 1st Sess. (1971), *Hearings on S. 1, S. 382, and S. 956, supra* note 60, at 98–102.

99. S. 956, tit. III, § 302(c), 92d Cong., 1st Sess. (1971), *Hearings on S. 1, S. 382, and S. 956, supra* note 60, at 132–133.

100. *Id.*

101. 47 U.S.C. § 312(a)(7) (1976), quoted in text *supra* at note 47. S.956 proposed that the language be inserted in § 315, but the Conference Committee placed the provision in § 312(a) as subsection (7). See note 103 *infra.*

102. *CBS v. FCC, supra* note 47, at 16 (emphasis in original).

103. See test *supra* at note 47 (emphasis supplied). The phrase "to permit purchase of," not originally in S. 956, see text *supra* at note 99, followed a suggestion by FCC Chairman Dean Burch during the hearings. *Hearing on*

and "or" normally connotes the disjunctive.[104] While "or" permissibly may be accepted in the conjunctive sense when that adequately appears to have been the legislative intent,[105] in this instance the disjunctive interpretation is clearly supported.

Each reference to Section 312(a)(7) in the legislative history of the Campaign Communications Reform Act speaks of the *sale* of time. S. 956, which contained what is now Section 312(a)(7), was cosponsored by Senators Scott and Mathias, and in introducing the bill Senator Scott stated that it "require[d] broadcasters to *sell* 'reasonable' amounts of time to all legally qualified candidates for public office." [106] In expostulating the bill on the floor of the Senate, Senator Mathias also referred to the *sale* of time.[107] Similarly, the summary of S. 956 presented to the Senate represented Section 312(a)(7) as a "[r]equirement that broadcasters may not refuse to *sell* 'reasonable' amounts of time to all legally qualified candidates for public office." [108] An examination of the transcript of the hearings on S. 1, S. 382, and S. 956 reveals that the Chairman of the Federal Communications Commission [109] and other witnesses [110] depicted the provision as one imposing a duty to *sell* time to candidates, a view shared by Senator Pastore.[111] And, when the Conference Report was taken up on the House floor, its objective was described as "requir[ing] broadcasters to permit any legally qualified candidate *to purchase* a 'reasonable amount of time' for his campaign advertising." [112]

This consistent characterization of the statutory text as a mandate for sale of a reasonable amount of time supplies firm support for a disjunctive reading. And when the rejection of S.1's free–time provision is recalled, the possibility that Congress intended to demand more than that broadcasters sell reasonable amounts of time seems very remote. Indeed, it would not make sense to read into Section 312(a)(7) an entitlement Congress unmistakably scrapped when it declined to enact S.1 or any of its provisions into the Campaign Communications Reform Act.[113] This conclusion is in harmony with Senator Pastore's declaration, a year after passage of that Act, that "there was a great deal of pressure to mandate free time" but that

---

S. 1, S. 382, and S. 956, supra note 60, at 189–190 (testimony of Dean Burch, Chairman, FCC). The Senate Commerce Committee amended S. 382, S.Rep.No.92–96, 92d Cong., 1st Sess. 3 (1971), by inclusion of a provision which, as changed only by the Conference Committee's modification of the phrase "qualified candidate" with the words "for Federal elective office," S.Rep.No.92–580, 92d Cong., 1st Sess. 22 (Conference Report 1971); H.R. Rep.No.92–752, 92d Cong., 1st Sess. 22 (Conference Report 1971), became the present § 312(a)(7).

**104.** *United States v. Moore*, 198 U.S.App.D.C. 296, 307, 613 F.2d 1029, 1040 (1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2922, 64 L.Ed.2d 811 (1980), and cases cited in note 84.

**105.** *Id.*, and cases cited in note 85.

**106.** 117 Cong.Rec. 3886 (1971) (remarks of Senator Scott) (emphasis supplied). See note 103 *supra*.

**107.** 117 Cong.Rec. 3896 (1971) (remarks of Senator Mathias).

**108.** 117 Cong.Rec. 3893 (1971) (highlights of S. 956) (emphasis supplied).

**109.** *Id.* at 189–190 (testimony of Dean Burch, Chairman, FCC).

**110.** See, *e. g., id.* at 325–326 (testimony of Senator Scott); *id.* at 418 (testimony of Leonard H. Goldenson, President, ABC).

**111.** 117 Cong.Rec. 29028 (1971) (remarks of Senator Pastore).

**112.** 118 Cong.Rec.H. 92 (daily ed. Jan. 19, 1972) (remarks of Representative Keefe) (emphasis supplied).

**113.** See *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 199–200, 95 S.Ct. 392, 400–401, 42 L.Ed.2d 378, 389–399 (1974); *Carey v. Donohue*, 240 U.S. 430, 436–437, 36 S.Ct. 386, 388–389, 60 L.Ed. 726, 728–729 (1916); *National Automatic Laundry & Cleaning Council v. Shultz*, 143 U.S.App.D.C. 274, 291, 443 F.2d 689, 706 (1971). See also *Wingo v. Wedding*, 418 U.S. 461, 470–472, 94 S.Ct. 2842, 2848–2849, 41 L.Ed.2d 879, 886–887 (1974).

446

Congress decided "to avoid that" and imposed something different.[114]

█ Consequently, we discern no right to free time for candidates for federal elective office under Section 312(a)(7) either from a reading of the statutory text or from our analysis of its legislative history. Remaining to be answered, however, is the question whether the "reasonable access" language of Section 312(a)(7) sometimes accomplishes that and by affording a right of access to broadcast facilities auxiliary to the Section 315(a) right to equal opportunities.

An equal–opportunity quality for Section 312(a)(7) is mentioned only fleetingly in the legislative history. The very few references to the section as an equal–opportunity provision all concerned S.956 and the role that Section 312(a)(7) would play upon the anticipated—but ultimately aborted—revocation of the equal–opportunity mandate of Section 315(a)) with respect to presidential and vice–presidential candidates.[115] In this context, there was but one notable allusion to Section 312(a)(7) as a guaranty of fair treatment of such candidates by broadcasters. The idea, advanced by Senator Mathias, was that after excluding presidential and vice–presidential candidates from the benefit of Section 315(a)'s equal–opportunity provision, Section 312(a)(7) could serve as a source of authority for requiring broadcasters selling time to one such candidate to

do the same for his opponents.[116] This suggestion seems to have contemplated no more, however, than that Section 312(a)(7) could operate as a means of assuring that broadcasters would make sufficient quantities of time for purchase available to candidates for presidential or vice–presidential office.[117]

Even assuming that these references tended somewhat to depict Section 312(a)(7) as something of an equal–opportunity auxiliary, that justification eroded away when the proposed partial suspension of Section 315(a)'s equal–opportunity provision failed to pass. There was warm support for suspension, which we noted earlier,[118] but many legislators were fearful of abolition of that provision. Despite the positive experience of the suspensions of the 1960's, grave doubts were raised, and the consequences of resting at the mercy of the broadcasters were viewed by some as too serious, especially by members of the House who were particularly wary of complete revocation.[119] Consequently, the Conference Committee decided to eliminate the portion of the Senate bill proposing elimination of Section 315(a)'s equal–opportunity requirement in presidential and vice–presidential campaigns,[120] and neither the final Conference Report nor the ensuing debate on the floor of either House again referred to Section 312(a)(7) as an equal–opportunity measure.[121]

114. *Hearings on S.372 Before the Subcomm. on Communications of the Senate Comm. on Commerce*, 93d Cong., 1st Sess. 194 (1973) [hereinafter cited at *Hearings on S.372*] (remarks of Senator Pastore).

115. The limited repeal of the equal–opportunity provision advocated by both S.382 and S.956 was subsequently amended by the Senate to provide for complete revocation of the clause for federal candidates. See 177 Cong.Rec. 20976, 26392–26394 (1971). The House, as noted earlier, insisted that § 315(a) remain intact, and the Conference Committee agreed. See S.Rep.No.92–580, 92d Cong., 1st Sess. 21 (Conference Report 1971); H.R.Rep.No.92–752, 92d Cong., 1st Sess. 21 (Conference Report 1971).

116. The Senator stated:
In a further effort to assure equal treatment for all media services and political candidates, the bill requires broadcasters to sell

reasonable amounts of time to all legally qualified candidates. This will assure that broadcasters who may favor one candidate over another will not be able to preclude one candidate from going on that station if he is ready, willing, and able to do so.
117 Cong.Rec. 3896 (1971) (remarks of Senator Mathias).

117. See text *supra* at notes 106–114.

118. See note 88 *supra* and accompanying text.

119. See, *e. g.*, 117 Cong.Rec. 43147 (1971) (remarks of Representative MacDonald).

120. S.Rep.No.92–580, *supra* note 115, at 22; H.R.Rep.No.92–752, *supra* note 115, at 22.

121. See S.Rep.No.92–580, *supra* note 115, H.R. Rep.No.92–752, *supra* note 115; 117 Cong.Rec. 46791–46801 (Senate), 46943–46951 (Senate) (1971); 118 Cong.Rec. 319–333 (House) (1972).

C. *The Administrative Interpretation of Section 312*

Save for the instant proceeding, the Commission has not had occasion to consider whether Section 312(a)(7) grants an automatic right to respond to broadcast material additional to that defined in Section 315(a); and here the denial of petitioner's rather vague argument on that point was unelucidated. The Broadcast Bureau dismissed reliance on Section 312(a)(7) for that purpose as misplaced, stating merely that this "section of the law was intended to insure that broadcasters make available reasonable amounts of time for *use* by federal candidates," [122] and the Commission affirmed without opinion of its own. [123] To be sure, this disposition evinces an underlying construction of Section 312(a)(7) not at all inharmonious with its legislative reflections, but it adds nothing to an understanding of why. There is, however, a significant history of administrative interpretation with respect to whether Section 312(a)(7), when it does obtain, grants its right of access on a free or a paid basis.

The Commission has consistently read Section 312(a)(7) as giving broadcasters the option of fulfilling their obligation thereunder by offering to candidates either free time or the privilege of purchasing time. The Commission first took this position in 1972, shortly after passage of Section 312(a)(7), when it issued a public notice in the form of questions and answers:

5. Q. Does the "reasonable access" provision of Section 312(a)(7) require commercial stations to give free time to legally qualified candidates for Federal elective office?

A. No, but the licensee cannot refuse to give free time and also [refuse] to permit the purchase of reasonable amounts of

time. If the purchase of reasonable amounts of time is not permitted, then the station is required to give reasonable amounts of free time.

6. Q. If a commercial station gives reasonable amounts of free time to candidates for Federal elective office, must it also permit purchase of reasonable amounts of time?

A. No. A commercial station is required either to provide reasonable amounts of free time or permit purchase of reasonable amounts of time. It is not required to do both. [124]

The Commission brought this public notice to the attention of Congress in 1973, [125] and neither then nor at any time thereafter has Congress expressed disagreement with the Commission's interpretation of Section 312(a)(7). To boot, the Commission has reiterated its original interpretation on subsequent occasions. In publications designed to furnish guidance to candidates and licensees, the Commission has constantly maintained that Section 312(a)(7) imposes upon licensees "the specific responsibility to afford *either* reasonable free access or the opportunity to purchase reasonable amounts of time to legally qualified candidates for Federal elective office." [126] In 1976, the Commission denied rulemaking petitions requesting a new regulation mandating free time for candidates. [127] And in its most recent political broadcasting primer, the Commission instructed:

The reader should also note that the law does not require a station to provide time free. It says the station either must provide reasonable access free or "permit purchase of reasonable amounts of time." Thus, if a station gives away enough time to a candidate to amount to "reasonable access" under the circumstances of the

---

**122.** *Bureau Opinion, supra* note 2, at 3, J.App. 5 (emphasis in original).

**123.** See text *supra* at note 29.

**124.** *Use of Broadcast and Cablecast Facilities by Candidates for Public Office,* 34 F.C.C.2d 510, 537 (1972).

**125.** *Hearings on S.372, supra* note 114, at 137.

**126.** *Licensee Responsibility Under Amendments to the Communications Act Made by the Federal Election Campaign Act of 1971,* 47 F.C. C.2d 516 (1974) (emphasis supplied).

**127.** *Petitions for Rulemaking,* F.C.C. Docket No. 76–472 (June 1, 1976).

case, it is not required to sell time to the candidate, and if it sells the candidate "reasonable amounts" it need not provide free time.[128]

■ We are duty bound to honor the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . ."[129] Especially should we do so when the agency's initial interpretation of the statute is substantially contemporaneous with its enactment.[130] And where, as here, the administrative interpretations have maintained consistency undeviatingly, there can be no doubt that the deference they command is considerably heightened.[131]

## D. Conclusions

■ The Communications Act envisions integration of two of its sections in a relatively uncomplicated scheme of access to broadcast facilities by candidates for public office. Section 312(a)(7) supplies a right of access by requiring broadcasters, on pain of license revocation, to make reasonable amounts of time available for use by legally qualified persons seeking federal elective office.[132] This right is unconditional in the sense that no prior use by any opponent of that candidate is necessary. Irrefutably, reasonable access is for the asking if the candidate is willing to pay,[133] and the

amount he can be charged is carefully limited by law.[134] The measure of the right remains constant, however, at "reasonable access."

■ Section 315(a), in turn, ordains that whenever a broadcaster permits any candidate for any public office—federal, state or local—to "use" broadcast facilities, the broadcaster must afford an equal opportunity to any legally qualified rival of that candidate who seeks it.[135] This right is contingent in nature; it does not come into fruition unless and until an opponent makes some "use" of station facilities,[136] but once that occurs it ripens, and the candidate becomes unconditionally entitled to equal opportunities, though to no more.[137] The Section 315(a) duty arises, however, only with respect to an opponent's "use" of broadcast facilities;[138] and coverage of an event within the purview of the four exemptions to that section is statutorily deemed a nonuse, and therefore does not activate the equal–opportunity requirement.[139]

In the process of interpreting Section 312(a)(7) in light of petitioner's claims, we have considered the statutory scheme,[140] pertinent legislative history[141] and the administrative construction ascribed to the statutory text.[142] Throughout we have found clear and consistent support for the conclusion that Section 312(a)(7) designedly

---

128. *The Law of Political Broadcasting and Cablecasting*, 69 F.C.C.2d 2209, 2288 (1978) (footnote omitted).

129. *CBS v. Democratic Nat'l Comm.*, 412 U.S. 94, 121, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772, 794 (1973), quoting *Red Lion Broadcasting Co. v. FCC, supra* note 44, 395 U.S. at 381, 89 S.Ct. at 1802, 23 L.Ed.2d at 384.

130. *E. g., Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796, 807 (1933).

131. *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808, 820 n. 20 (1979); *United States v. National Ass'n of Sec. Dealers*, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486, 504 (1975); *Leary v. United States*, 395 U.S. 6, 25, 89 S.Ct. 1532, 1542, 23 L.Ed.2d 57, 75 (1969).

132. See text *supra* at note 47.

133. See text *supra* at notes 103–114.

134. See text *supra* at notes 94–97 and note 97 *supra*.

135. See text *supra* at note 35.

136. See text *supra* at notes 38–39.

137. See text *supra* at notes 39–40.

138. See text *supra* at note 35.

139. See text *supra* at note 37.

140. See Part II–A *supra*.

141. See Part II–B *supra*.

142. See Part II–C *supra*.

assures candidates for federal elective office of reasonable access to station facilities. The statutory language and historical precedents also make plain that this section does not, however, confer the privilege of using the broadcaster's facilities without charge.[143]  Rather, we have found that broadcasters may meet the demands of Section 312(a)(7) either by an allotment of free time or by making time available for purchase.

■ We are satisfied, too, that a candidate cannot secure broadcast time, free or otherwise, through the simple expedient of reading Section 312(a)(7) as just another equal–opportunity provision.  Nothing in the history of the section's evolution or its administrative interpretation serves to validate the thesis that it confers a second responsive right to broadcast privileges that may be employed as a supplement to Section 315(a)'s equal–opportunity mandate. And without some clear indication that Congress so intended, we perceive no justification for such a reading.  Settled principles of statutory construction militate strongly against that interpretation, for it would engender grave doubt as to the internal consistency of the statutory scheme.

If Section 312(a)(7) were to be viewed as an auxiliary source of entitlement to equal opportunities, the exemptions to Section 315(a) would easily be destroyed.  The purpose of these exclusions, it will be recalled, was to free broadcasters who carried any of four types of newsworthy "political" events from the equal–opportunity burden, and thereby to encourage more complete coverage of these events.[144]  Should Section 312(a)(7) be construed as automatically entitling a candidate to responsive broadcast access whenever and for whatever reason his opponent has appeared on the air, Section 315(a)'s exemptions would soon become meaningless.  Statutes are to be interpreted, if possible, to give operation to all of their parts,[145] and to maintain them in harmonious working relationship.[146]  Congress has devised a comprehensive and cohesive plan in which Section 312(a)(7), Section 315(a) and the latter's exemptions all have well–defined missions.  No provision may be misused to defeat the effective functioning of another.

Consequently, we do not find in Section 312(a)(7) a right of access that Section 315 denies.  Petitioner has not advanced any claim under Section 315(a), nor has it quarreled with the networks' unanimous conclusion that the broadcasts of the President's March 14 speech and press conference were immune from the equal–opportunity command of that section.  We hold that petitioner cannot use Section 312(a)(7) to circumvent the explicit exemptions of Section 315(a).[147]

143.  See text *supra* at notes 102–121.  We realize that there may be occasions when "reasonable access" does require a broadcaster to provide time to a candidate free of charge.  *Cf. Red Lion Broadcasting Co. v. FCC, supra* note 44 (fairness doctrine may compel a broadcaster to allot free time for presentation of an alternative position on a controversial issue of public importance when the station or network itself has indorsed or attacked a particular candidate or point of view).  To mandate free time to a candidate, however, solely on the basis of the quantum of coverage a broadcaster gives an event specifically exempted from § 315(a)'s equal–opportunity obligation is to defeat the purpose of the exemptions.  See text *infra* at notes 144–146.

144.  See text *supra* at note 37; *Kennedy I, supra* note 6, text at notes 43–45.

145.  *Administrator v. Robertson*, 422 U.S. 255, 261, 95 S.Ct. 2140, 2145, 45 L.Ed.2d 164, 171

(1975)); *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207, 225 (1973); *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 591–592, 7 L.Ed.2d 492, 499 (1962).

146.  *FPC v. Panhandle E. Pipe Line Co.*, 337 U.S. 498, 514, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499, 1509 (1949); *Maiatico v. United States*, 112 U.S.App.D.C. 295, 301, 302 F.2d 880, 886 (1962); *Fisher v. District of Columbia*, 82 U.S. App.D.C. 371, 372–373, 164 F.2d 707, 708–709 (1948).

147.  As we observed in *Democratic Nat'l Comm. v. FCC*, 148 U.S.App.D.C. 383, 460 F.2d 891, *cert. denied*, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972),

[w]e are not unsympathetic to the plight of the party out of the White House but sympathy cannot be allowed to deter the public from the maximum information it can obtain.

■ We further hold that petitioner is not in position to utilize Section 312(a)(7) in the manner in which Congress designed it to function. Petitioner has never claimed that it was denied an opportunity to buy time; rather, it has insisted that the networks violated Section 312(a)(7) simply by refusing to provide free time to Senator Kennedy. We have seen that the section entitles a candidate to free time only if and when a broadcaster refuses to sell a reasonable quantity of time.[148] No showing of that sort has been made, or indeed undertaken.

We thus find petitioner's Section 312(a)(7) arguments unpersuasive. We turn now to a consideration of its contentions under the fairness doctrine.

### III. THE FAIRNESS DOCTRINE CLAIM

■ Petitioner's last claim of entitlement to free broadcast time for Senator Kennedy is founded upon the well–known fairness doctrine.[149] That label shorthands a twofold requirement that broadcasters give adequate coverage to controversial issues of public importance and fairly reflect contrasting viewpoints in that coverage.[150] Petitioner does not impugn the networks' honesty in rejecting its free–time request; indeed, it has expressly represented both to the Commission and this court its belief that in doing so the networks acted in good faith.[151] Given that, the issue before us is whether the fairness doctrine sustains petitioner's theory that Senator Kennedy was wrongly denied use of the networks' facilities for presentation of his views on the economy.

In the opinion and order affirmed by the Commission, the Broadcast Bureau found three fatal flaws in petitioner's fairness complaint. One was a failure to define specifically the particular controversial issue involved.[152] Another was the absence of any evidence indicating that the networks had neglected fairly to present contrasting viewpoints on the publicly–important aspects of the economy in the course of

One of the primary sources for public information concerning the nation and its welfare is from the Presidential broadcast. While political scientists and historians may argue about the institution of the Presidency and the obligations and role of the nation's chief executive officer it is clear that in this day and age it is obligatory for the President to inform the public on his program and its progress from time to time. By the very nature of his position the President is a focal point of national life. The people of this country look to him in his numerous roles for guidance, understanding, perspective and information. No matter who the man living at 1600 Pennsylvania Avenue is he will be subject to greater coverage in the press and on the media than any other person in the free world.
*Id.* at 397, 460 F.2d at 905 (footnote omitted). See also *CBS v. FCC*, 147 U.S.App.D.C. 175, 177, 454 F.2d 1018, 1020 (1971).

**148.** See Parts II–B, II–C *supra.*

**149.** Brief for Petitioner at 30–32; see *Bureau Opinion, supra* note 2, at 5–6, J.App. 7–8.

**150.** See generally *CBS v. Democratic Nat'l Comm., supra* note 129, 412 U.S. at 110–111, 93 S.Ct. at 2090, 36 L.Ed.2d at 788; *Red Lion Broadcasting Co. v. FCC, supra,* note 44, 395 U.S. at 377–378, 89 S.Ct. at 1799–1800, 23

L.Ed.2d at 382; *Brandywine–Main Line Radio, Inc. v. FCC,* 153 U.S.App.D.C. 305, 327–335, 473 F.2d 16, 38–46 (1972), *cert. denied,* 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973); *Fairness Report,* 48 F.C.C.2d 1, 5 (1974), *reconsideration denied,* 58 F.C.C.2d 691 (1976), *aff'd in part and rev'd in part on other grounds sub nom. NCCB v. FCC,* 186 U.S.App.D.C. 102, 567 F.2d 1095 (1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2060, 56 L.Ed.2d 769 (1978); *Applicability of Fairness Doctrine in Handling Controversial Issues of Public Importance (Fairness Primer),* 40 F.C.C. 598, 607 (1964); *Report on Editorializing by Broadcast Licensees,* 13 F.C.C.2d 1246, 1257–1258 (1949). A special facet of the fairness doctrine is the "personal attack" rule, but it "does not apply to attacks made by candidates or their campaign associates on other candidates or their associates." *New Primer on Political Broadcasting and Cablecasting,* 69 F.C.C.2d 2209, 2225 (1978); see 47 C.F.R. § 73.1920 (1979).

**151.** Brief for Petitioner at 29; see *Bureau Opinion, supra* note 2, at 5, J.App. 7. See also *Brandywine–Main Line Radio, Inc. v. FCC, supra,* note 150, 153 U.S.App.D.C. at 333, 336, 473 F.2d at 44, 46.

**152.** *Bureau Opinion, supra* note 2, at 7 n. 13, 8, J.App. 9 n. 13, 10.

their overall programming.[153] Still another was the asserted impropriety of insisting that a particular individual—Senator Kennedy—serve as a spokesman.[154] We uphold the Commission on all counts.

A complaint invoking the fairness doctrine, we have said,

> must present prima facie evidence of a fairness doctrine violation. Prima facie evidence consists of specific factual information which, in the absence of rebuttal, is sufficient to show that a fairness doctrine violation exists.... [T]he complainant must produce prima facie evidence of a violation before the broadcaster will be burdened with establishing compliance with the fairness doctrine.[155]

We think the Bureau was adequately justified in concluding that petitioner fell well short of this standard.

In its opinion, the Bureau observed that petitioner "nowhere states with specificity what it believes the controversial issue really is."[156] In its several arguments, petitioner has referred merely to such general topics as "the nation's economic crisis,"[157] "inflation, one of the most important issues in the 1980 presidential campaign,"[158] and "the economic stewardship" of the President.[159] We agree with the Bureau that a complainant must define the proffered issue with greater particularity. In both its fairness primer[160] and its political broadcasting primer[161] the Commission has emphasized the need to identify the issue precisely, and this court has upheld the reasonableness of such requirements.[162] Chief Judge Wright capsulized the requirement when very recently he admonished that the issue "must be ... highly specific, one that can be defined with precision and can be addressed and responded to directly and efficiently by the broadcaster."[163]

This is not an idle demand. As we have been careful to explain, "[a] broadcaster must have a clear understanding of the issue forming the basis of a complaint in order to assess its compliance with the fairness doctrine. Unless a broadcaster can recognize the issue 'with precision and accuracy,' ... proof of compliance with the fairness doctrine requires the production of 'recordings or transcripts of all news programs, editorials, commentaries and discussion of public issues, many of which are treated over long periods of time.' "[164] Imprecise formulation of a controversial issue put forth thus can lead to "imposition of such onerous burdens on broadcasters [that] would, in practice, defeat the policy of 'en-

---

153. *Id.* at 6–8, J.App. 8–10.

154. *Id.* at 6, J.App. 8.

155. *American Security Council Educ. Foundation v. FCC,* 197 U.S.App.D.C. 124, 131–132, 607 F.2d 438, 445–446 (1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980) (footnotes and citations omitted).

156. *Bureau Opinion, supra* note 2, at 7 n. 13, J.App. 9 n. 13.

157. *Free Time Request, supra* note 15 at 1, J.App. 11.

158. Letters from John E. Nolan, Jr., William C. Oldaker, and Joseph F. Hennessey, on behalf of petitioner, *to* William J. Tricarico, Secretary of the Commission (Apr. 17, 1980) at 1 J.App. 32.

159. Brief for Petitioner at 17.

160. *Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, supra* note 150, 40 F.C.C. at 600.

161. *New Primer on Political Broadcasting and Cablecasting, supra* note 150, 69 F.C.C.2d at 2300. See also *Broadcast Procedure Manual,* 49 F.C.C.2d 1, 5 (1974); *Memorandum Opinion and Order on Reconsideration of the Fairness Reports,* 58 F.C.C.2d 696 (1976); *Fairness Reports, supra* note 150.

162. See *e. g., American Security Council Educ. Foundation v. FCC, supra* note 155, 197 U.S. App.D.C. at 132–133, 607 F.2d at 446–447; *Hale v. FCC,* 138 U.S.App.D.C. 125, 127–128, 425 F.2d 556, 558–559 (1970); *see also, e. g., Democratic Nat'l Comm. v. FCC, supra* note 147, 148 U.S.App.D.C. at 399–400, 460 F.2d at 907–908.

163. *American Security Council Educ. Foundation v. FCC, supra* note 155, 197 U.S.App.D.C. at 145, 607 F.2d at 458 (Wright, C. J., concurring) (footnote omitted).

164. *Id.* at 137, 607 F.2d at 451, first quoting *American Security Council Educ. Foundation,* 63 F.C.C.2d 366, 368 (1977), and next quoting *Allen C. Phelps,* 21 F.C.C.2d 12, 13 (1969).

couraging robust, wide–open debate.' " [165] In final result, "[i]ssue ambiguity in the fairness doctrine context is a certainty to lessen the free flow of information favored by the First Amendment, and is therefore unacceptable." [166] We are not disposed to blink procedural transgressions that jeopardize realization of this lofty goal.

Even if this flaw could be excused, another is immediately perceived. The Bureau pointed out that petitioner "has not presented any evidence that the networks have failed in their overall programming to present contrasting views on the issue of the economic crisis facing America." [167] Moreover, said the Bureau,

[e]ven if [petitioner] believes that the controversial issue of public importance in this case is defined as which candidate for the Democratic Party's nomination has the soundest economic policies, there is no evidence presented that this issue was discussed in the broadcast. Again, we note that the networks have indicated that they have presented coverage of Senator Kennedy's economic viewpoints.[168]

The fairness doctrine does not operate with the dissective focus of Section 315(a)'s equal–opportunity provision; [169] it "nowhere requires equality but only reasonableness." [170] Intelligent assessment of the nature and caliber of a broadcaster's overall programming obviously cannot be confined to one program, or even to one day's presentations,[171] so a failure to show some fairness deficiency on the whole is necessarily fatal. Wide discretion must be accorded broadcasters in their programming, and while short–run imbalances desirably are to be minimized, it is only in the long run that a well–rounded approach to fairness considerations becomes feasible. The objectives of the fairness doctrine are thus best promoted by encouraging "the discussion and presentation of controversial issues in the various broadcast program formats ... for it is just not practical to require equality with respect to a large number of the issues dealt with in a great variety of programs on a daily and continuing basis." [172] So it is that compliance with the fairness doctrine is to be determined on the basis of the broadcaster's programming in its entirety.[173] As the Bureau foresaw, the alterna-

165. 197 U.S.App.D.C. at 137, 607 F.2d at 451, quoting *Allen C. Phelps*, 21 F.C.C.2d 12, 13 (1969).

166. *Id.* at 144, 607 F.2d at 458 (Wright, C. J., concurring).

167. *Bureau Opinion, supra* note 2, at 6, J.App. 8.

168. *Id.* at 7, J.App. 9 (footnotes omitted).

169. The fairness doctrine "is distinct from the statutory requirement of § 315 of the Communications Act that equal time be allotted all qualified candidates for public office." *Red Lion Broadcasting Co. v. FCC, supra* note 44, 395 U.S. at 369–370, 89 S.Ct. at 1796, 23 L.Ed.2d at 377–378 (footnote omitted). "The fairness doctrine is not subject to a formulistic application. Meeting the obligations can only be achieved by seeking out balance in broadcast coverage. Precise mathematic equality is neither required nor desirable. The cornerstone of the doctrine is good faith and licensee discretion." *Brandywine–Main Line Radio, Inc. v. FCC, supra* note 150, 153 U.S.App.D.C. at 333, 473 F.2d at 44.

170. *Democratic Nat'l Comm. v. FCC, supra* note 147, 148 U.S.App.D.C. at 397, 460 F.2d at

905 (footnote omitted). See also *NBC v. FCC*, 170 U.S.App.D.C. 173, 202, 516 F.2d 1101, 1130 (1974), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976).

171. "There is no requirement that the opposing views be aired in the same program, or even in the same series; they must simply find a place in the station's overall programming. The format and the choice of a spokesman for the competing views are left to the licensee's discretion 'subject only to a standard of reasonableness and good faith.' " *Straus Communications, Inc. v. FCC*, 174 U.S.App.D.C. 149, 155, 530 F.2d 1001, 1007 (1976), quoting *Fairness Report, supra* note 150, 48 F.C.C.2d at 8 (footnote omitted).

172. *Bureau Opinion, supra* note 2, at 5, J.App. 7, quoting *Fairness Primer, supra* note 150, 40 F.C.C. at 599.

173. See *Red Lion Broadcasting Co. v. FCC, supra* note 44, 395 U.S. at 127, 89 S.Ct. at 1808, 23 L.Ed.2d at 387; *Straus Communications, Inc. v. FCC, supra* note 171, 174 U.S.App.D.C. at 155, 530 F.2d at 1007; *Brandywine–Main Line Radio, Inc. v. FCC, supra* note 150, 153 U.S.App.D.C. at 335, 473 F.2d at 46; *Fairness Report, supra* note 150, 48 F.C.C.2d at 19–20.

tive would involve the agency "much too deeply in broadcast journalism; [causing it to] become virtually a part of the broadcasting 'fourth estate,' overseeing thousands of complaints that some issue had not been given 'equal treatment.' " [174]

The Commission customarily finds a fairness–doctrine violation only upon a showing that the broadcaster's decision was unreasonable or in bad faith, a review standard we have consistently endorsed.[175] Petitioner has not attempted to refute the networks' representations that they have afforded and will continue to afford extensive coverage of all views, including Senator Kennedy's, on questions of economic policy.[176] Particularly in this milieu, we have no cause to overturn the Bureau's holding that "[i]n order for [petitioner] to make out a prima facie case under the Fairness Doctrine, it must offer much more complete evidence than that provided in its April 4 letter [to the Commission] that the networks have not balanced their coverage of controversial issues." [177]

Addressing what it deemed to be a third deficiency in petitioner's complaint, the Bureau held that the fairness doctrine did not endow Senator Kennedy with an individual right to broadcast his views on the current economic crisis.[178] Undoubtedly there are cases wherein a particular individual may be an appropriate spokesman for a particular position.[179] Absent that peculiar situation, however, it is the rule that, in the Bureau's words, "under the Fairness Doctrine, no specific individual or group is entitled to present the contrasting viewpoints." [180] Petitioner neither alleged nor endeavored to show that the Senator is

uniquely and singularly qualified to represent those who dispute the President's economic leadership or strategies. Certainly with the networks' assertions that they have already presented a wide range of views on the state of the Nation's economy, the fairness doctrine does not confer an individual right on Senator Kennedy to address these issues on the air.

We thus find petitioner's fairness doctrine contentions, as well as those implicating Section 312(a)(7), to be unacceptable. The order under review is accordingly

*Affirmed.*

MacKINNON, Circuit Judge (concurring):

I concur in the opinion by Judge Robinson but wish to make two points with respect thereto.

*First,* as to legislative history. The opinion cites much so–called legislative history. However, I wish to make the point that the mere failure of Congress to pass a bill that has been introduced does not constitute "legislative history" of Congressional intent *to reject* the provisions in said bill that are *not* incorporated in final legislation accomplished by another bill. In the absence of an up or down vote on the specific provision the intent of Congress cannot be said to have been expressed. Thus, to my mind the conclusion cannot be reached from Congress' failure to enact S. 1 that Congress thereby "unmistakably scrapped" any provision therein. See the court's opinion at page 445. With thousands of bills introduced in every Congress if failure of enact-

174. *Bureau Opinion, supra* note 2, at 5, J.App. 7. See also *CBS v. Democratic Nat'l Comm., supra* note 129, 412 U.S. at 126–127, 93 S.Ct. at 2098, 36 L.Ed.2d at 797–798.

175. *Straus Communications, Inc. v. FCC, supra* note 171, 174 U.S.App.D.C. at 156–157 & n. 18, 530 F.2d at 1008–1009 & n. 18, and cases there cited.

176. See text *supra* at notes 12–14.

177. *Bureau Opinion, supra* note 2, at 8, J.App. 10.

178. *Id.* at 6, J.App. 8.

179. See *id.* at 7 & n. 14, J.App. 9 & n. 14.

180. *Id.* at 6, J.App. 8. See *CBS v. Democratic Nat'l Comm., supra* note 129, 412 U.S. at 113, 93 S.Ct. at 2091, 36 L.Ed.2d at 789; *Kennedy I, supra* note 6, *at* n. 97 and authorities there cited; *American Security Council Educ. Foundation v. FCC, supra* note 155, 197 U.S.App. D.C. at 131, 134, 607 F.2d at 445, 448; *Green v. FCC,* 144 U.S.App.D.C. 353, 358, 447 F.2d 323, 328 (1971).

ment in the form introduced were taken to indicate Congressional intent practically any intent desired could be demonstrated.

*Second,* as to the court's citation at page 451 of *American Security Council Educ. Foundation v. FCC,* 607 F.2d 438 (D.C.Cir. 1979), since I joined in the dissent in that case, I do not agree that the factual situation in that case constituted a failure to properly specify the relevant issue.